## HARRELL *v.* ROSE BROTHERS & COMPANY.

1. Under the evidence submitted, the plaintiff was entitled to a finding against the plea in abatement filed by the defendant.
2. The court erred in granting a nonsuit, and should have submitted the questions made by the evidence, under proper instructions to the jury.

No. 3706.    FEBRUARY 26, 1924.    REHEARING DENIED MARCH 1, 1924.

Equitable petition. Before Judge Hutcheson. DeKalb superior court. March 9, 1923.

*Carl T. Hudgins,* for plaintiff.

*Branch & Howard,* for defendants.

BECK, P. J.    Harrell brought his petition seeking an injunction to prevent the defendants from tearing down and removing a certain building on lands alleged to have been bought by the plaintiff from the U. S. Government, the land being located in what was formerly Camp Gordon; the title to the land upon which this camp was located having been acquired by the U. S. Government during the late war. The land in controversy was purchased by the plaintiff from the U. S. Government on October 15, 1921, at auction sale conducted by one Girth, auctioneer for the Government; and he took orders for deeds for each lot bought by him at such sale. There were several of these purchases, each of them evidenced by a separate bill of sale or order for deed, and each reciting the payment of certain cash sums, and specifying how and when deferred payments were to be made, and further directing therein that the Fulton National Bank of Atlanta, Georgia, deliver deeds for such purchases when the plaintiff should have paid off the sums in full. Each of the papers evidencing the transactions between the plaintiff and the U. S. Government was in the same form, except that on some of them buildings were specified as passing with the purchase represented by the contract, and the purchase-price in each instance was different. They were signed by the agents of the United States Government and by the purchaser, bore date of

October 15, 1921, and specified that possession was immediate.
A condition attached in each instance was that the possession was
subject to the right of entry of purchasers of temporary buildings
and other property in Camp Gordon to salvage and remove the
same. Under the testimony of the plaintiff, the building in ques-
tion, "D-2-6," was located on lots 50 and 51; he made the first
purchase of any property at said sale, buying all the property he
bought on the first and second days of the sale and considerably
in advance of such purchases as were made by the defendants. He
immediately put certain marks and signs on the property bought
by him, on which the building in question is located, and placed
tenants in possession of certain of the buildings, who lived therein
at the time defendants made their purchases by which the defend-
ants also claimed to have acquired title to the building in question.
Plaintiff also introduced evidence as to the character of the build-
ings in question on the lands which he purchased; also the contract
of bill of sale between the U. S. Government and the defendants,
dated October 25, 1921, which included in the purchase of the de-
fendants the building in question. Plaintiff further testified: "A
man named Girth acted as auctioneer. . . I was present when the
sale was opened. Mr. Girth announced he was the auctioneer, agent
of the United States Government to sell the land, and under his
oral announcement he stated that all permanent buildings, dwell-
ings, or buildings of any description that were on the land when
the Government acquired title to the land would go back with the
land to the purchaser. All buildings that were not torn away
would go back with the land, regardless of what the Government
had added to them or to the improvements, and all temporary
buildings put there by the Government would be sold separate from
the land. I specifically called Girth's attention to the fact that
this building D-2-6 was on the land I contemplated buying, and
that certain additions had been made in the way of wings." Plain-
tiff also put in evidence his "order for deed," dated October 15,
1921; and in part testified further: "I made the first cash payment
on the land, I will say, in about 10 minutes of the time it was
knocked off to me. It was demanded of me at the time. That was
one of the oral announcements made at the beginning of the sale.
I got my bills of sale the 25th of October. The sale was held on

October the 10th I think. I got my contracts 14 or 15 days after the sale. It was offered me several days after the sale. I raised an objection that D-2-6 was not on the bill of sale. I told him I would not sign it unless he put it on the bill of sale. He said he would report that I refused to sign it. I went away then and didn't get any. I went on the last day at the Piedmont Hotel and signed the bill of sale and notes. Mr. Girth, the auctioneer, was at the hotel, and I tried to see him between the time the property was knocked off and the time I found him on the last day at the hotel. I went to the hotel but once when he was there. I did not see him, but they said he was there, the stenographer said he was there in the room. I was never permitted in to see him. You might call it a conversation I had with him. I asked him if I wasn't going to get this to let me get my money back. If I wasn't going to get the property I bought I wanted to get my bid rejected so I could get my money back. He said it was up to Washington and waved me aside. It was on the 10th I bought and I got immediate possession. My posession was evidenced by my going out to the people who lived in the house I had bought. I talked with them, and on the houses that no one lived in I wrote my name and said 'Private property, keep out,' with my name on it. I wrote my name and put such signs on this particular building. I arranged with some families to stay in the houses they were in. One stayed about two months and another several months. I can name some of the persons who were present when this property on which building D-2-6 is located was offered at sale." Plaintiff also testified as to the character of the building in controversy. Another witness, introduced by the plaintiff, testified in part: "Rose Bros. & Co. made their purchases, a warehouse, the second day or third day of the sale, I think it was. I am pretty sure they did not purchase any the first day. They opened the sale in the morning, I guess about 9:30 or 10 o'clock, I believe it was, not being positive, and ran the sale during the day, and opened again the next morning, and continued on that way three or four or five days, four days, I think it was. The sale would adjourn until the next morning at 8 or 9 o'clock or whatever time it might be. There were announcements made by the auctioneer. No announcements were made each day. The announcement was made at the beginning of

the sale on the first morning of the sale. Rose Brothers were present at that time. Mr. Girth made the announcement the morning of the beginning of the sale, and said any building that was a permanent building when the Government purchased the land, regardless of how much improvement had been done to it by the Government, reverted back into the land and that the man that bought the land would get the building. I heard Mr. Harrell ask Mr. Girth with reference to a building, I couldn't say what particular building, but Mr. Harrell did ask Mr. Girth in regard to the buildings, on in some buildings, I do not know what building it was he was talking about, but I know about where it is at. He had bought two or three lots, and he asked about two more lots, I think adjoining, that he had been informed that there was a permanent building, and if it was, would he get it if he bought those lots, and Mr. Girth told him he would. The auctioneer said any building that was a permanent building before the Government bought the land would go with it regardless of additions or how much improvements during the time the Government had it. It was immediately afterwards put up, Girth put it up in three or four minutes, soon as he walked back to the stand, and Mr. Harrell bought it. I have looked for some of the posters I put up, but am unable to find any. All I remember is that they advertised about 3000 acres of land for sale. I have no interest in the case whatever. . . I was not present when Mr. Harrell signed his contract. I do not know what took place then. I heard Girth state as a part of his announcement that he wanted it understood that the Government wasn't bound by any statement he might make. Some property was sold where it is and as it is. I think I heard him make that announcement. He sold so much Government stuff and sold it where it is and as it is, I wouldn't be positive. I believe he did sell some that way. No, I didn't know Rose Brothers bought 77 buildings on the first day of the sale. I would say they didn't. I don't know when they bought building D-2-6. The conversation between Mr. Harrell and Mr. Girth was on the second day of the sale. It must have been about 10:30 in the morning. It was after the sale had run something like an hour. It started sometimes before 10, as well as I remember. It seems to me it started at 9 o'clock." There was other testimony, not necessary to set out here, both as to the character of

the building and as to what was said by the Government auctioneer at the time of the sale.

The defendants answered, admitting their intention of tearing down and removing the building, but alleging that they had title to the property and that plaintiff did not have title. Both parties claim to have acquired title from the United States Government. The defendants alleged that the building in question was not a permanent building, but was temporary in character. Defendants also filed a special plea in abatement, setting up the contention that the United States Government was a necessary party, and that the suit should not proceed until it had been made a party.

The court overruled the plaintiff's motion to strike the defendants' plea in abatement. After the evidence was closed the defendants moved for a nonsuit, which was granted, and the plaintiff excepted.

1. Under the evidence in this case, the jury should have been instructed to find against the plea in abatement, in so far as it set up the contention that the U. S. Government was a necessary party. But when the court refused to strike the plea in abatement, the issue made by it should have been tried first, under proper and regular course of procedure. However, when the court did not dispose of the plea in abatement separately and in the first instance, but proceeded with the trial and admitted evidence upon the merits of the case, which also illustrated the question as to whether or not the United States Government should have been made a party, he should, upon conclusion of the evidence, have instructed the jury that there was no merit in the plea in abatement; for, under the evidence submitted, the Federal Government was not a necessary party; it had disposed of all its rights to the property in controversy; and the plaintiff, if he showed, as claimed in the petition, title to the buildings in question, was entitled to a verdict of the jury in his favor and the injunctive relief sought. Civil Code, § 5577; *Moses* v. *Watson,* 65 *Ga.* 196; *Huxford* v. *Southern Pine Co.,* 124 *Ga.* 181 (52 S. E. 439). Having ruled that the issue made by the plea in abatement should, under the facts in the case, have been found in favor of the plaintiff, it is unnecessary to pass upon the question as to whether or not the plea should have been stricken because of a failure to file or failure to give notice of the filing of the same.

2. The statement of facts as set forth here contains only a part of the evidence introduced. Several other witnesses testified as to the character of the buildings in question, and others testified as to what was said at the time of the sale. But under the entire evidence contained in this record we are of the opinion that issues were made which should have been submitted to the jury, under proper instructions from the court, for their determination, and that the court erred in granting a nonsuit.

*Judgment reversed. All the Justices concur.*